RECORD NUMBER: 13-4753(L)

# United States Court of Appeals

*for the*

# Fourth Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

BOBBIE JO BROWN, MITCHELL EDWARD GARVIN,

*Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT ABINGDON

# OPENING BRIEF OF APPELLANTS

**CASEY ALLEN SEARS, II**
**ATTORNEY AT LAW**
**128 Market Street**
**Johnson City, TN 37604**
**(423) 773-4719**

*Counsel for Appellant Brown*

**DOUGLAS L. PAYNE**
**LAW OFFICE OF**
 **DOUGLAS L. PAYNE**
**401 West Irish Street**
**Greenville, TN 37743**
**(423) 639-2220**

*Counsel for Appellant Garvin*

CP  COUNSEL PRESS • VA – (800) 275-0668

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................ii

JURISDICTIONAL STATEMENT .............................................. 1

STATEMENT OF THE ISSUES.................................................. 1

STATEMENT OF THE CASE...................................................... 2

    1. THE NATURE OF THE CASE ...................................... 2

    2. THE COURSE OF PROCEEDINGS ............................. 2

    3. DISPOSITION BELOW .................................................. 3

    4. STATEMENT OF FACTS ............................................ 3

SUMMARY OF ARGUMENT .................................................... 12

ARGUMENT ............................................................................ 13

    I.    THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT THE DEFENDANTS OF CONSPIRACY TO PASS FRAUDULENT CHECKS AND KNOWINGLY AND INTENTIONALLY UTTERING FRAUDULENT CHECKS ........................................ 13

    Standard of Review........................................................ 13

    Discussion of the Issue .................................................. 13

CONCLUSION ........................................................................ 18

STATEMENT REGARDING ORAL ARGUMENT ................................. 19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Cases**

Burks v. United States,
    437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) ............................... 13

Global-Tech Appliances, Inc. v. Seb S.A.,
    131 S.Ct. 2060 (2011)........................................................................ 16

Jackson v. Virginia,
    443 U.S. 307 (1979)........................................................................... 13

United States v. Cobb,
    905 F.2d 784 (4th Cir. 1990) ............................................................. 17

United States v. Jinwright,
    683 F.3d 471 (4th Cir. 2012) ............................................................. 17

United States v. Schnabel,
939 F.2d 197 (4th Cir. 1991) ....................................................... 17

United States v. Tresvant,
    677 F.2d 1018 (4th Cir. 1982) ...................................................... 13, 18

**Rules, Statutes and Other Authorities**

18 U.S.C. § 371 .................................................................................... 1

18 U.S.C. § 514(a)(2).......................................................................... 1

28 U.S.C. § 1291 .................................................................................. 1

Rule 4(b) of the Federal Rules of Appellate Procedure.................................. 1

## JURISDICTIONAL STATEMENT

This appeal is from the conviction of Bobbie Jo Brown and Mitchell Edward Garvin for violations of 18 U.S.C. § 514(a)(2) & 18 U.S.C. § 371 (Conspiracy to Defraud the United States by Passing Counterfeit or Fraudulent Checks, Count One – both Defendants), and 18 U.S.C. § 514(a)(2) (Passing Counterfeit Checks, Five Counts Each).  All of these events were alleged to have occurred in the Western District of Virginia within the jurisdiction of the District Court.  This Court has subject matter and appellate jurisdiction pursuant to the foregoing statutes and pursuant to 28 U.S.C. § 1291 and Rule 4(b) of the Federal Rules of Appellate Procedure (to review a criminal conviction).  Appellants Brown and Garvin were found guilty on all counts charged in a jury trial that took place on July 8-9, 2013.  Appellant Brown was sentenced by the District Court in a Judgment Order dated October 1, 2013, and she timely filed an appeal of that decision on October 1, 2013.  Appellant Garvin was sentenced by the District Court in a Judgment Order dated October 1, 2013 and noted his timely appeal of that decision on October 3, 2013.  Both appeals are from a Final Judgment that disposed of all claims.

## STATEMENT OF THE ISSUES

Whether the evidence was sufficient as a matter of law to support Defendants' convictions in the District Court?

1

## STATEMENT OF THE CASE

**1.  The nature of the case**

The government contends that the Defendants unlawfully conspired with others, including themselves, to pass fraudulent or counterfeit checks and actually passed or uttered nine (9) such counterfeit checks, all at the same time, at a Wal-Mart store in Bristol, Virginia.  The government contends that both Defendants became involved in a scheme masterminded by Tina Gillett, the purpose of which was to cash ComData checks, often at the behest of others, in which the person cashing the check would receive a small payment and the rest of the money would go to a handler who made all arrangements and accompanied the Defendants. Gillett recruited a woman by the name of Whitley Grindstaff, who the government contends recruited the defendants Brown and Garvin to cash at least nine (9) checks totaling $1,758.75 at the Wal-Mart in Bristol, Virginia.  The checks the Defendants passed utilized the company name "PGT Trucking".  The involvement of the Defendants Brown and Garvin lasted one day, December 17, 2012, for a total of nine (9) checks totaling $1,758.75.

**2.  The course of proceedings**

On July 5, 2013, Defendant Garvin submitted to the Court a proposed jury instruction on the issue of deliberate ignorance.  The Court adopted the instruction in part.

2

A joint trial was conducted of Defendants Brown and Garvin on July 7 and 8, 2013. Witnesses testified; exhibits were introduced; and, at the conclusion of the trial, the case was given to the jury to deliberate its verdict.

Both Defendants made oral motions for judgment of acquittal at the close of the government's case in chief. Defendant Garvin presented no evidence and rested. Bobbie Jo Brown presented evidence and testified.

### 3. **Disposition below**

The jury returned a unanimous verdict of guilty on all nine (9) counts as to Defendants Brown and Garvin. On September 30, 2013, Brown was given a sentence of probation on each count to run concurrently. On September 30, 2013, Mitchell Edward Garvin was sentenced to time served with three years of supervised release. Garvin's pretrial release was revoked during the trial, and he was confined until the date of his sentencing.

### 4. **Statement of Facts**

The Defendants Brown and Garvin were charged along with seventy other individuals in a 142 count Superseding Indictment filed on May 6, 2013. (J.A. at 31-66).

During the two day trial which commenced on July 8, 2013, the government introduced the following evidence.

Paul Vargo was the first witness to be called to testify. Vargo testified that he worked for P. G. T. Trucking as the Director of Risk Management and Insurance. (J.A. at 70). He testified that Bobbie Jo Brown, Mitchell Garvin, Angel Iuli, Whitley Grindstaff, Lorie Duncan, and Tina Gillett were not employees of PGT Trucking. (J.A. at 71).

Benjamin Joseph Denny, a fraud analyst for Comdata Corporation, testified that his company provided a service known as a Comchek. (J.A. at 72-73). Comcheks are typically used by truck drivers. They can be picked up at most truck stops, banks, checking cashing stores, and through employers. (J.A. at 73-74). Denny testified that the person presenting the check to a merchant for cashing is the one who fills it out. (J.A. at 75). A Comchek requires an express code. The express code is given to the individual filling out the check, usually by his/her employer. (J.A. at 75). The express code tells Comdata how much to pay the truck driver and where the money is coming from. (J.A. at 75). Denny reviewed the four checks signed by Bobbie Brown and the five checks signed by Mitchell Garvin and testified that each was false and fictitious. (J.A. at 76-78, 141-158).

The next witness called by the Government was Alexi Fehl. Fehl is a fraud investigator for a company called Certegy Check Services. Certegy processes checks for retail stores and payroll merchants, including both Wal-Mart and Comdata. (J.A. at 86-87). Fehl testified, when a check is cashed at Wal-Mart,

information, including date, time, driver's license, and Social Security Number, is transmitted to Certegy. If a presenter has a history of passing a bad check at Wal-Mart, the check will be dishonored at the cashier. (J.A. at 87-88). Comdata checks because of their wide range of use are not blocked. (J.A. at 90-91).

The next witness to testify was Jackie Ray, Jr. (J.A. at 97). Ray is an employee of Wal-Mart in Bristol, Virginia and holds the title of Asset Protection Associate. (J.A. at 97). Mr. Ray authenticated a surveillance video from the store showing Brown and Garvin cashing Exhibits 1 and 2 on December 17, 2012. (J.A. at 100, 373). The video was shown to the jury.

The next witness to testify was Angel Iuli. (J.A. at 110). Iuli testified that she, individually, cashed Comdata checks on December 10th and December 17, 2012. (J.A. at 111). She started cashing checks after she was introduced to check cashing by Lori Duncan. Duncan told Iuli that she had a friend that was dying of cancer, and that the friend needed checks to be cashed. (J.A. at 111). For cashing these checks, Iuli was paid $200.00. Iuli further met an individual by the name of Whitley Grindstaff while they were incarcerated together. (J.A. at 112). Later, they became roommates. Iuli recounted that, on December 17, 2012, Lori Duncan called her and asked Iuli for a ride. She and Duncan met Garvin and Brown in Bristol at the Food City parking lot. Iuli was neither close friends, neighbors, or co-workers of either Brown or Garvin. (J.A. at 113-114). She stated her only

5

involvement was being a driver for Lori Duncan. Iuli testified that she traveled to a BP station and Lori Duncan entered and returned with Comdata checks. (J.A. at 116). Iuli saw Duncan give the checks to Brown and Garvin. (J.A. at 116). The group traveled to Wal-Mart. Iuli, at the request of Lori Duncan, accompanied Garvin and Brown into the store. (J.A. at 120). Lori Duncan, likewise, entered the Wal-Mart. (J.A. at 121). Iuli testified that she had never spoken to Garvin on the date in question nor had she overheard any conversations with Mitchell Garvin. (J.A. at 135). Iuli testified that she believes the December 17th episode was to help Tina Gillett, a cancer victim. (J.A. at 137-138). Iuli claims she only realized Lori Duncan's scheme when she was arrested on February 20, 2013. (J.A. at 138). Iuli testified that the reason she was actually present with Brown and Garvin was to verify that the cashing of the checks was legitimate and that she had cashed checks. (J.A. at 138). Iuli testified that, on December 17th, she believed that when Brown and Garvin cashed the checks it was legitimate. (J.A. at 139).

The next witness to testify was Jasmine T. Newman. (J.A. at 191). Newman testified that Lori Duncan was recruited by Angel Iuli to come from Knoxville, Tennessee to Bristol, Virginia to cash seven Comdata checks drawn on "P. G. T. Trucking". She testified that she did not work for P. G. T. Trucking and was not entitled to the money. (J.A. at 191-195). Newman testified that she cashed the checks to get extra Christmas money for her niece. She thought, as she

6

was cashing the checks, that she was helping a friend that had cancer. Duncan had told her about a "Courtney" who had cancer and needed the money for her medicine. (J.A. at 197). Newman did not implicate Brown or Garvin.

The next witness to testify was Whitley Nicole Grindstaff. (J.A. at 202). She, likewise, had cashed Comdata checks in her name. (J.A. at 203). Grindstaff was recruited by Lori Duncan. (J.A. at 203). Her story was much the same as has been stated by other witnesses, i.e., she was told a friend had cancer, she owned a trucking company, and she needed people to cash checks because she (the cancer victim) had a bad check at Wal-Mart and the checks would not be honored. (J.A. at 204). The cancer victim was supposedly a woman by the name of "Tina Gillett". Grindstaff stated that her own benefit for cashing the checks was that she was eight months pregnant and needed extras to provide for her daughter. (J.A. at 204). Grindstaff testified that she knew Bobbie Brown but did not know Mitchell Garvin. (J.A. at 206-207). Grindstaff testified that her own mother was named Denise Grindstaff. On December 17th, Denise Grindstaff was incarcerated in the Washington County Detention Center in Jonesborough. Whitley confided to Denise she had been cashing the checks. Denise then confided in Heather Brown (Bobbie Jo Brown's sister who was, likewise, incarcerated with Denise in Jonesborough) about the check cashing scheme. Heather Brown got Angel Iuli's number and gave it to Bobbie Jo Brown. Whitley and Bobbie Jo Brown talked on

7

the telephone and agreed to meet at Wal-Mart to cash the checks.  Whitley was

present at the Wal-Mart and saw Lori Duncan hand Bobbie Jo Brown and Mitchell

Garvin the checks.  (J.A. at 209-211).  Whitley learned that Bobbie Jo Brown and

Mitchell Garvin were cashing the checks in order to raise money for Heather's

bond.  (J.A. at 212).  Grindstaff testified that, on December 17th, she was unaware

that what was happening was illegal and did not realize it until February 20, 2013

when she was incarcerated.  (J.A. at 223).  A co-defendant told her no one had

cancer.  (J.A. at 224).  Grindstaff testified that she never spoke to Mitchell Garvin.

(J.A. at 228).

    The next witness to testify was Amanda Jane Kemp.  (J.A. at 229).  Kemp

testified that she had cashed Comdata checks under the direction of Lori Duncan

and Angel Iuli.  As with most of the people charged in this conspiracy, she

testified,

> You know, at the time, I was pretty vulnerable.  I was in a pretty
> bad situation, and I really needed the money.  I should have
> thought a lot more than I did, and now that I look back I was very
> stupid and I was very ignorant and should have known better, but
> it's too late to cry over spilled milk.  I did it, and I can't fix it.  I
> can only try to do better.

(J.A. at 233).  The witness never testified that she knew or had contact with Brown

or Garvin.

    The next witness to testify was Daulton Spellar.  (J.A. at 241).  Spellar

testified that he, too, was a check casher.  He was recruited by Tiffany Bowers and

told that her father had a trucking company and that, if Spellar cashed the checks, he would receive a job with the company. (J.A. at 243). Unlike some of the other co-defendants, Spellar received only lunch and a pack of cigarettes for his work. (J.A. at 246). The witness never testified that he knew or had any contact with Brown or Garvin.

The next witness to testify was Derek Sluss. (J.A. at 253). Sluss cashed Comdata checks. He was recruited by Jess Cook. He was told that a woman owned a trucking company, that she and her husband were going through a nasty divorce, that she was entitled to some of the money because she was a part owner of the trucking company, and that the Comdata checks were a way for her to extract her money from the company. (J.A. at 254-255). Sluss testified that he did not intend to defraud Wal-Mart. (J.A. at 262). He testified on cross-examination, "I thought everything was legit. I didn't really understand that it was not, that it was not truthful on the checks." (J.A. at 262). It was not until he was arrested and interviewed by the Secret Service that he realized that he had done something wrong. (J.A. at 263-264). Sluss testified that he did not know he had entered a conspiracy until he was told in February of 2013. (J.A. at 265). He testified rather succinctly to the question, "You entered a conspiracy to cash legitimate checks on the day that you cashed them." Answer, "… that sounds about correct." (J.A. at 266). Sluss did not testify that he knew or had contact with Brown or Garvin.

The next witness to testify was Greg Watson of the United States Secret Service. (J.A. at 267). He testified and explained the government's theory of the case. He testified that there was no evidence from interviews that anyone shared information with Defendants Brown or Garvin that the check cashing scheme was a scam. (J.A. at 281-282).

The government rested; and counsel for the Defendants made oral motions for judgment of acquittal. (J.A. at 292-294). The motions were denied. (J.A. at 294).

Bobbie Brown presented direct evidence. The first defense witness to be called was Rhonda Jean Boggs. (J.A. at 300). Boggs was the mother of Bobbie Jo Brown and Heather Elaine Jones, the latter being incarcerated in federal custody. (J.A. at 300-301). Boggs testified that, in mid-December, she received a telephone call from her daughter, Heather, who told her of a plan to get money by cashing checks. (J.A. at 301). Jones had an interest in contacting her mother because she was trying to locate an attorney to represent Heather. (J.A. at 302). Boggs was contacted by Whitley Grindstaff. Boggs questioned Grindstaff about the purpose and legitimacy of the plan. (J.A. at 303-304). Boggs, herself, had intended to cash checks because she thought it was legitimate but was told that they no longer needed her when she arrived at Wal-Mart. (J.A. at 306). Boggs testified that Bobbie Brown spoke to Whitley Grindstaff and gave personal identifying

10

information for herself and Mitchell Garvin to be inserted into the checks.  (J.A. at

325).  The total compensation for all parties involved was a total of $100.00 for

Boggs as the driver and $50.00 each for Bobbie Brown and Mitchell Garvin.  (J.A.

at 327).

Bobbie Jo Brown testified in her own defense.  (J.A. at 335).  Brown

testified that she received a telephone call from her sister, Heather, on the

afternoon of December 17th.

> She had presented an offer to make some legitimate money.  All I
> had to do was cash a few checks for this girl because she said she
> didn't have an ID.  She was trying to get an apartment before the
> baby was born and have, you know, electricity and everything
> turned on.  And I agreed to help as long as the deal was legitimate.
> I did not want to get anything, you know, that was going to get me
> in any kind of trouble because I had a lot to lose because of it.

(J.A. at 336)

> When we arrived at the Wal-Mart…me and my boyfriend,
> Mitchell Garvin, and my mother all had got out of the vehicle.
> And Whitley Grindstaff had approached my mother, and told her
> that she did no longer need her assistance, and we were never told
> why; that she would only need me and my boyfriend, Mitchell
> Garvin.  And we proceeded to walk into the entrance of Wal-Mart.
> We were handed the checks right before we were entering Wal-
> Mart.  So, we had not seen the checks until we were getting ready
> to enter the Wal-Mart.

(J.A. at 337-338).

"She give me four, and she give my boyfriend, Mitchell Garvin, five."  (J.A. at

338).

11

"The check cashing place closed at 9:00 p.m. We went to one of the cash registers, and the woman told us that was running that aisle right there, she said, 'I have to go speak to my supervisor to see if we'll be allowed to cash this type of check.' And we stood there and waited on her to come back, and she said it would be, her supervisor said it would be okay to cash the checks as long as we had a valid ID and the checks would go through the scanner, that everything would be okay."

(J.A. at 338).

Brown testified concerning Mitchell Garvin as follows:

"Q     Did Mitchell Garvin have any conversation with anyone other than you        about all of this?

A     No, sir, he did not…he did not talk to my sister about this deal, whatever."

(J.A. at 356).

Defendant Garvin rested, and the jury was charged.

## SUMMARY OF ARGUMENT

The Government's evidence was insufficient as a matter of law to sustain convictions of conspiracy to pass fraudulent checks and knowingly and intentionally uttering fraudulent checks. There was no evidence presented by the Government or Defendant Brown that either Brown or Garvin had knowledge that they were involved in anything illegal, therefore there could be no intent to defraud. Neither recklessness nor negligence gives rise to criminal liability under the Court's instructions for intentional ignorance. When the evidence in this case is viewed in the light most favorable to the government, reasonable people cannot

12

differ that the evidence was insufficient to convict the Defendants as charged.

## ARGUMENT

I.    THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT THE DEFENDANTS OF CONSPIRACY TO PASS FRAUDULENT CHECKS AND KNOWINGLY AND INTENTIONALLY UTTERING FRAUDULENT CHECKS.

**Standard of Review**

The standard of review as to the sufficiency of evidence supporting a conviction is whether there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision to convict.  Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).

**Discussion of the Issue**

It is undisputed that, on December 17, 2012, Bobbie Jo Brown and Mitchell Garvin cashed at least nine checks totaling $1,758.75 at the Wal-Mart in Bristol, Virginia.  The checks were made out to Brown and Garvin, respectively, for between $194.50 and $197.50 (J.A. at 141-158).  It is undisputed that Brown's checks were made payable to her and Garvin's checks were made payable to him. Both Garvin and Brown used valid forms of ID when cashing the checks, and each endorsed his or her name on the back of the checks with a legitimate signature. (J.A. at 141-158).  The only issue in dispute is whether the Defendants cashed these

13

checks with fraudulent intent, i.e., whether Brown and/or Garvin knew at the time of the cashing of the checks that the check was fraudulent (i.e. not authorized by Comdata or the trucking company). The checks were not stolen; they were instruments readily available at truck stops and convenience stores. (J.A. at 72-75). No system was in place to prevent anyone from obtaining these checks. The system itself anticipates the payee – the person actually cashing the checks – is the person who typically will fill in the blanks before cashing it. (J.A. at 75). Stated simply, ANYONE can legitimately cash a Comdata check as long as it has the proper authorization code. The checks are valid when they are assigned an authorization code which stores and cashing centers are supposed to verify before negotiating them. The four checks cashed by Brown and the five checks cashed by Garvin were alleged to be fraudulent because they were not authorized by the appropriate entity and, therefore, did not contain authentic authorization codes which would have been necessary to validate the checks. (J.A. at 75-80).

Brown and Garvin's participation in the cashing of the checks arose as a result of Brown's sister, Heather Jones, calling to her family, begging them to raise money for an attorney to secure bond for her release from the Washington County, Tennessee Detention Center prior to Christmas. Brown and her mother, Rhonda Jean Boggs, were assured that there was nothing fraudulent or wrong with the request. Defendant Garvin relied only on the statements made to him by

14

Codefendant Brown that her sister needed help in raising money and that this was a legitimate way of doing so. Neither Brown nor Garvin are sophisticated individuals. In fact, one of the hallmarks of this scheme was for people of low income and desperate means to be recruited for the cashing of these checks. Neither Brown nor Garvin had a way of knowing that the authorization codes entered on the checks were not valid. No one with whom Brown and Garvin met gave them any indication that what they were doing was fraudulent or in any way wrong. Evidently, even the Wal-Mart cashier was of the mindset that the cashing of the checks was legitimate. The cashier accepted the nine checks and alerted no one to a problem. The cashing of these checks appeared to have been routine and was done within a short span of time.

The Government did not produce a single witness that could testify that either Brown or Garvin knew or had reason to know that they were participating in anything illegal. All the testimony and evidence was consistent with the fact that neither defendant had knowledge or intent to defraud.

The jury received instruction number 15 from the Court which read in pertinent part:

> You may find that a defendant acted with the intent to defraud if you conclude that he or she was willfully blind to what was obviously taking place. You may find that a defendant was willfully blind if the evidence proves beyond a reasonable doubt

15

that the defendant deliberately closed his or her eyes to what would have otherwise been obvious. That is, that he or she had a conscious purpose to avoid enlightenment.

Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of a fact. Actual knowledge and deliberate or conscious avoidance of knowledge are the same thing.

On the other hand, for you to conclude that the defendants were willfully blind to the criminal nature of what was taking place, the evidence must show something more than recklessness, negligence, careless disregard, foolishness or mistake. It is not sufficient that the defendants merely should have known what was occurring or that in the exercise of hindsight they should have known what was occurring. Instead, the government must prove beyond a reasonable doubt that the defendants purposefully and deliberately avoided learning all the facts.

(J.A. at 369, 552).

In <u>Global-Tech Appliances, Inc. v. Seb S.A.</u>, 131 S.Ct. 2060 (2011), the

Supreme Court stated:

While the courts of appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements:  1) the defendant must subjectively believe that there is a high probability that a fact exists and 2) the defendant must take deliberate actions to avoid learning of that fact.  We think these requirements give willful blindness an appropriate limiting scope that surpasses recklessness and negligence.  Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts…by contrast a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing…a negligent defendant is one who should have known of a similar risk but, in fact, did not see.

16

(*Id* at 270-271).

The district court did not charge the Defendants with definitions of recklessness or negligence as requested in the proposed jury instruction by Garvin. (J.A. at 532-554).  Nevertheless, the Court was clear that careless disregard, foolishness, or mistake could not result in criminal liability by Defendants Brown and Garvin.  In sum and substance, all the evidence adduced at trial led to an inescapable conclusion that the Defendants, desperate and simple people, were reckless, negligent, careless, foolish, and made a mistake but did not have criminal intent.

When a jury instruction is challenged on appeal, the key issue is "whether taken as a whole, the instruction fairly states the controlling law."  United States v. Cobb, 905 F.2d 784, 788-89 (4th Cir. 1990).  This court has approved "willful blindness" theories of prosecution and corresponding instruction, so long as the jury is not permitted in infer guilty knowledge from a mere showing of careless disregard or mistake.  United States v. Jinwright, 683 F.3d 471, 478-80 (4th Cir. 2012).  In order to sustain a conviction, however, this Court appears to require that there be evidence "of both actual knowledge and deliberate ignorance…"  United States v. Schnabel, 939 F.2d 197, 203, 204 (4th Cir. 1991).

The Defendants' motions for judgment of acquittal at the end of the Government's case were denied by the trial court.  (J.A. at 294).

17

Denial of a Rule 29 motion should be affirmed on appeal if, "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the Defendant guilty beyond a reasonable doubt." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). In assessing denial of a Rule 29 motion, the appellate court considers "circumstantial evidence, as well as direct evidence, and allow(s) the government the benefit of all reasonable inferences from the facts proven from those sought to be established." *Id.*

The Defendants submit that, because there was substantial evidence in the trial to establish that there was no fraudulent intent on their part, coupled with the absence of any direct evidence as to their immediate recruiters having imparted any knowledge of an illegal scheme, that there is ample evidence to overturn the jury's verdict in this matter and enter a judgment of acquittal.

## **CONCLUSION**

For the foregoing reasons, Appellants Bobbie Jo Brown and Mitchell Edward Garvin respectfully request that the Court reverse and vacate the Judgments and enter Judgments of Acquittal.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument would not aid the Court's decisional process in this matter and is therefore waived by Appellants Bobbie Jo Brown and Mitchell Edward Garvin.

Respectfully submitted this 8th day of April, 2014.

BOBBIE JO BROWN


By:    s/_____
CASEY SEARS, II
Attorney for Appellant Brown
Tennessee State Bar No.  026576
128 East Market Street
Johnson City, Tennessee 37604-5712
(423) 773-4719


MITCHELL EDWARD GARVIN


By:    s/_____
DOUGLAS L. PAYNE
Attorney for Appellant Garvin
Tennessee State Bar No. 013380
401 West Irish Street
Greeneville, Tennessee 37743
(423) 639-2220

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 13-4753(L        **Caption:** US v. Bobbie Brown and Mitchell Garvin

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [✓]    this brief contains _____4,541_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

    [ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Douglas L. Payne_____

Attorney for Appellant Garvin_____

Dated: 4/8/2014_____

# CERTIFICATE OF SERVICE

I certify that on <u>April 8, 2014</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Ajay J. Alexander
Steven Randall Ramseyer
OFFICE OF THE U.S. ATTORNEY
180 West Main Street
Suite B19
Abingdon, VA 24210-0000
276-628-4161
USAVAW.ECFAbingdon@usdoj.gov

<u>s/ Douglas L. Payne</u>                    <u>4/8/2014</u>
          Signature                                             Date